Number 23-10128, Meshal v. Commissioner, Georgia Department of Public Safety. Are you waiting on me? Oh, you may begin. Thank you, Your Honor. May it please the Court. The District Court wrongly denied the defendant, Georgia State Trooper's qualified immunity because the convergence of facts during the traffic stop strongly suggested that Meshal was involved in criminal activity. The District Court applied the wrong standard for both reasonable suspicion and probable cause, wrongly refused to consider the facts as a whole and what a reasonable officer would deduce from the situation, and failed to follow the basic qualified immunity rule that there is no clearly established Fourth Amendment law without a case with similar facts holding that the officer lacked reasonable suspicion or probable cause. And at minimum, the no-fly list posed such an unusual circumstance that the Fourth Amendment's application here could not possibly have been clearly established. I'll start with the merits analysis. The District Court made two basic mistakes here. First, it analyzed each of the facts on their own instead of in the totality of the circumstances, and it also discounted several facts because it said they were susceptible to an innocent explanation. And the Supreme Court, as recently as District of Columbia v. Wesby, said both are incorrect. The Court needs to view things in the totality of the circumstances, and purely innocent lawful activity on its own can give rise to reasonable suspicion. If we agree with you, aren't we running into a situation where every time there's a traffic stop and somebody comes up on the no-fly list, that will entitle the officer to extend the stop until they've made contact with the FBI, whenever that might be? Two responses. The first one is the focus that we have here is on the totality of the circumstances. We're not saying that this one factor on its own should be dispositive. We're saying that there were four different factors here. Michal was on the no-fly list, but he had also just made a large delivery to the side of the Super Bowl. He gave a basic— Everybody leaving the Super Bowl, you pull them over and detain them for 90 minutes, handcuff them, put them back in the car? No, there are plenty of people leaving. There are fans, other people leaving the Super Bowl. How soon or far removed in time was his stop from the Super Bowl? So, Michal's stop was, I believe, around 10 days before the Super Bowl, so he made the delivery in the period where staff was preparing the event. And no reported instances of any misconduct at the Super Bowl? Any dangerous activities? Any problems? So, the law enforcement spends many months before the Super Bowl monitoring, trying to deter, prevent— I know, but you can't cuff everybody who delivers something to the Super Bowl count. Greg, so I think, to look at the facts of this case, I think there are sufficient facts here. Again, the question is, we're trying to ensure that the officers who are investigating for criminal activity, they're not certain that there's criminal activity, that they're investigating based on objective facts. And I think there are four facts here that were relevant that the officers considered. The no-fly list, the delivery to the Super Bowl, but also, Michal gave inconsistent and somewhat deceptive answers to the officers' questions, and he had an arrest record. And I think the combination of those things presented a situation where the officers could tell that something— He had an arrest record, he thought, for a minor misdemeanor offense, didn't he? That's correct, that— It didn't even show up on NCIC, did it? There's no description other than—we're at the motion to dismiss stage. Right. We're only dealing with what was in the complaint. Got to take it as true. Right. So, we're dealing with the fact that Michal has presented that the officers were aware of, which included, at this stage, the fact that he had an arrest record that he had been arrested. Driving with a suspended license. So, I think that is still relevant. The sorts of facts that this court has held give rise to reasonable suspicion are very broad. One example is a person simply being in a high-crime area can add into the reasonable suspicion analysis. The law enforcement BOLO alerts that just give a general description of a vehicle or the clothing that someone is wearing that go out on the radio and say, hey, we're concerned that this person was involved in criminal activity, please stop them. This court has held repeatedly that those sorts of basic but objective facts are enough to get the officers— But you didn't have that in this case. So, we do have the no-fly list alert, which is at least as relevant as a law enforcement BOLO alert. It's a notice— That's critical to your case. If he hadn't been on the no-fly list, you would have zero case. Even you would have conceded that this was a wrongful stop in detention for 90 minutes, right? I agree that the no-fly list was important. No, no, no, no. Don't change my question. It's critical to your position, is it not? It's critical because it also— It's essential to your position, is it not? Take the no-fly list out of here and you wouldn't be standing here. Yes, at that point, all we would have is, let's say, just a minivan, a family coming back from the supermarket. Okay, then you need to address the instructions. It appears from the complaint, I thought originally it was from the terrorist's office, but it appears to have maybe been from the NCIC office that they say don't detain anybody based on this alone. If you look behind that, and I'm not saying you should because it's not specifically listed in there, the reason why is it doesn't take much to get on that list. You probably remember when the late Senator Ted Kennedy was on the no-fly list as a suspected terrorist. I think even the most partisan Republicans would not ever have accused him of that, but there his name was and he got stopped at the airport on several occasions. That is what's probably behind the admonitions from somebody quoted in the complaint. Don't arrest this person just on the basis of this and don't stop him or detain him just on the basis of this. Correct? I think that is one way to read the notice. Give me another way, counsel. The other way to read it is the generalist information is supposed to be classified and law enforcement stopping an individual for no other reason than they're on the list could tip off and potentially spoil counterterrorism activities by the FBI. So the reason they're saying do not stop individuals based just on this information is because they're trying to keep this information classified. But even if this notice was trying to suggest that there may have been a Fourth Amendment concern in the federal government's perspective, that would start to look like a redux of the Supreme Court's case in Virginia versus Moore where the court said even if something is a violation of state law, that doesn't turn it into a Fourth Amendment violation. It's a question of what does the Constitution prohibit, and if a state law doesn't turn something into a Fourth Amendment violation, a notice to law enforcement coming from the FBI saying maybe there's a concern here, that doesn't create a Fourth Amendment violation. You're putting a lot of weight into the language or reading behind the language of this alert. I guess the word encounter, it says contact the terrorist screening center during the encounter. If this would extend the scope or duration of the encounter, contact the TSC immediately thereafter. And then it goes on to say attempt to obtain sufficient identifying information during the encounter without otherwise extending the scope or duration of the encounter. You seem to be looking to the motivation of why this exists, but the plain language is telling the officer don't extend the stop because this, merely because this person is on the no-fly list, right? It's completely fair reading to say that the officers didn't do exactly what this notice asked them to do. But the question is, the fact that this notice informed them that this individual was on the terrorist watch list gave them information that they triangulated with the other information before them and gave them concern that there was potential terrorism. It's because of the Super Bowl delivery. I mean, that's what it boils down to. But obviously, terrorist attacks can occur at other events, other than a high-profile event like the Super Bowl. So pulling over somebody for a traffic violation, finding they're on the no-fly list and they've made a delivery to a church or to an elementary school or to a federal courthouse, is that enough? We're dealing with probabilities and the slight changes in the facts increase or decrease the probabilities. But I think, so this is all in the merits analysis. I think what's particularly important here is this is a question of qualified immunity. And this list, even though, as Joe Terms mentioned, there are some famous instances of people being on the no-fly list, it very rarely applies to U.S. citizens. We know, as the Supreme Court recently said in FBI v. FICRE, only one in 14 individuals on the overall list are included on the no-fly list. We also know that a tiny, tiny fraction of the terrorist watch list overall is made up of U.S. citizens. In fact, 99.6% of the list is not made up of U.S. citizens. So this is a very rare designation. And the question is, did these officers, who maybe had never run into a situation where they stopped someone who was on this list, know that it was clearly established that if they factored this into their analysis, they were liable because this violated the individual's Fourth Amendment rights? Well, the question is not whether these officers knew. It's whether. There's a big difference. Let me ask you another question about the other factors. I didn't see any reference to the Super Bowl in the complaint. It says that he told the officers he dropped off a load in Miami. So did they know? How do you know that they knew he'd been to the Super Bowl location? I believe it is more specific. I could look back and point it to you, but it says they dropped it off at the venue where the Super Bowl was being held. The Hard Rock Stadium, I believe, is what it says in the complaint. And that was the venue where the Super Bowl was scheduled to be held in about a week. In another circumstance, you pointed to that he gave evasive or inconsistent answers. That's not in the complaint, is it? So the facts are, I think this was part of the problem with the district court's analysis. It said if there's any innocent explanation for the facts that we're dealing with here, I have to go with the innocent explanation. That's not how the reasonable suspicion or the probable cause. You're not answering our question. We're in the complaint. Is there anything about inconsistent answers? So the facts that were in the complaint were that Michal told the officers initially that he had only been arrested for a suspended license, but then he changed his story after he found out that they knew he was on the terrorist watch list and admitted that he had been detained by federal authorities. That's not arrested. He was arrested. So, again, we're dealing with the complaint. I think if Your Honor is interested in more information, Michal sued the FBI. No, all we're interested in is what's in the complaint. The complaint says that he was detained by federal officials abroad. The difference between detained and arrested is very clear. Back in my speeding younger days, I was detained a number of times on the side of the road. That doesn't say he's been arrested. These detentions were much longer. It was a four-month detention abroad by the FBI. But, again, all of that to say we're dealing with qualified immunity and what the officers knew. Let me ask you a question about the search of the truck and the use of the dog. So it was not simply a situation where the dog was walked around the truck. The dog was placed inside of the truck. Can you give me your best argument for why there would be qualified immunity for that? I think Tamari is our best case there. The vehicle in that case had driven up to a property where law enforcement was conducting a drug raid. The driver didn't have paperwork. He said, I'm here to look at some animals. The officers thought that the vehicle was similar to one of the vehicles driven by someone that they were seeking in the drug raid. And this court held that amounted to probable cause for them to search the vehicle for evidence of criminal activity. So that sort of information isn't clear. Maybe there's a connection to criminal activity was enough in that case. So if that's the sort of thing that the officers were aware of, then this very quick let the dog do a sniff inside the vehicle would have been appropriate as well, at least on the qualified immunity side. The officers wouldn't have known that they were violating clearly established law. Thank you. Good morning, Your Honor. May it please the court. Court has accepted the plaintiff, Mr. Amir Mishaw. Counsel, let me ask you one thing off the bat because this watch list issue is so important. You said the document was publicly available. Are you talking about the document that the terrorist office puts out? Are you talking about the NCIC policy manual? Your Honor, I'm not sure exactly what you're referring to. I know we do allege that there is an NCIC guidance manual that is publicly available. But perhaps this goes to your earlier question. No, no, no. What it goes to is my law clerks couldn't find it. The Office of Information and Research in the court couldn't find it. And the DOJ couldn't supply it. So I'm wondering. Now, I found reports I think earlier than that one talking about how everything It was more a report to Congress than anything about how it functioned and all that sort of stuff. But if you're talking about the NCIC handbook, which you do refer to several times in there, I don't think it's publicly available. I know that's not your only argument for why they should be charged with knowledge of the content, but it's one of them. So, Your Honor, my memory to what you're referring to is that we were able to find the guidance from a Google search. But our allegation is that this NCIC notice showed up at the moment that they ran Mr. Michal's information. So it's... Oh, sorry. Go ahead. All right. So your allegation is that at the moment... I think I know what you're talking about. It says... Well, what I was talking about, paragraph 59, the NCIC's 2009 operating manual is publicly available. I'm just telling you, unless I'm not a member of the public, it isn't publicly available. So to the extent you're relying on that... And I don't know if it's judicially noticeable or not, but it's a problem to me. Because if it... Judge, if I can respond, I think I understand what you're getting at. Let me help you a little bit. Paragraph 61. I think this is critical to the argument you're making about the cautions and caveats in the policy handbook. Therefore, any message or code that the NCIC transmitted to Defendant Januska or the other defendant officers about Mr. Michal would likely have advised them to call the TSC during or after the stop, but not to extend it. Would likely have. That may be a close call under Iqbal and Twombly as to whether it advised them or not. I'm not sure. But that's what you're trying to say is there's a publicly available document. This is what it says. We don't have that in evidence in the case. It's a complaint. But what we're saying is he says that he saw come up terrorists. And if he saw that, it's likely the officers saw this. That's pretty close on Iqbal and Twombly, isn't it? So, Your Honor, our allegations go beyond that. So we point to the... This complaint obviously was pre-discovery. We had an indication that there had been a notice that had come up when they detained Mr. Michal. And we looked to this guidance to try to figure out what exactly the wording of the notice said. And defendants have agreed with us that that is, in fact, the NCIC notice that officers saw. So we are alleging that under the guidebook, this was the language that would have come up. And defendants have agreed. They've made no... Nothing in their responses or briefing or anything have said we were wrong about that allegation. And so what we are dealing with is... Well, at this stage, they don't have to, do they? Well, Your Honor, if you're looking at the face of the complaint and you're making all inferences in Mr. Michal's favor, to me, it's clear that what we are dealing with is this NCIC notice. And that is what appeared and what is referenced throughout the complaint. And I'd like to turn, since we're on this notice, to some of Judge Branch's questions and to my opposing counsel's response. As I heard my opposing counsel, he seems to be arguing that the plain language of this notice should not be interpreted to mean what it says. But this notice, which they are almost entirely relying on, and I know they are now arguing and have started arguing and briefing, that it was not this notice alone that led to the detention and the search of Mr. Michal. But again, looking at the allegations, looking at the face of the complaint, Mr. Michal alleges several times that the officers told him, you are being detained because of this notice. And what I heard from opposing counsel was that this notice isn't clear. It's not instructive about what the office were supposed to do or not do. In our view, Your Honors, we have a situation where police officers were given contemporaneous written instructions for how to comply with the law. But they then disregarded those instructions and they proceeded to detain Mr. Michal, to pat him down, handcuff him, put him in the back of the squad car, and search his truck without reasonable suspicion or probable cause. And they did that despite seeing this NCIC notice that told them three times not to do that. And now, Your Honors, they come here and they say what they were supposed to do and not do wasn't clear enough. It is very clear under this court's well-settled precedent that officers need reasonable suspicion to detain a suspect and probable cause to search a vehicle. They had neither here. All they had was some hunch, some suspicion that there could be criminal activity afoot. The law is very clear that a hunch, an inarticulable suspicion, is not enough. Well, I'm not sure they have an inarticulable suspicion. I think they have articulated it, that it's not just simply that he was on the no-fly list. He was pulled over for committing a traffic violation. He does have a misdemeanor on his record. But obviously, most importantly, he had just made a commercial delivery to the Super Bowl, which is that is what had apparently set off all the alarm bells. Well, Your Honor, I don't agree that that's what set off all the alarm bells. They asked Mr. Michal about his travel plans early into the stop, and Mr. Michal responded, told the officers that he was making a delivery to the Super Bowl, and then provided a bill of lading. In other words, provided proof that, in fact, he had just made this delivery, and it was in the course of his employment. It's important also, Your Honors, to notice that what the law requires when it comes to reasonable suspicion and probable cause is reasonable suspicion or probable cause of a specific criminal activity. For the first time in their reply brief, and I'm cognizant, Judge Gartens, of your earlier exchange with one of the prior litigants about forfeiture and arguments versus issues. But in their reply brief, they say for the first time, it was reasonable to be suspecting some type of terrorist activity. That goes to a core issue of the case, which is what exactly was the crime that they allegedly were investigating? And for the first time in their reply brief, they say, oh, well, maybe it was terrorism, which still is very broad. But never have they said that there was any indication of specific criminal activity. And that's exactly what this court requires. You can't have a mere hunch that something is wrong. You have to be able to articulate and indicate what exactly is suspicious or gives probable cause of a specific criminal activity. And the fact, Your Honors, that they brought in both a narcotics searching dog and an explosives searching dog is further evidence that this was nothing more than a fishing expedition. They didn't know what they were looking for. They didn't know why exactly they were detaining Mr. Michal. They just knew that something felt amiss. And that cannot amount to reasonable suspicion or probable cause under this case's and the U.S. Supreme Court's well-settled precedent. And to the extent, again, that they rely on this NCIC notice, it told them three times, do not do what you are about to do. Call us. This is reason to call us and let us know about this stop. But do not detain this person. Do not extend the scope or the duration of this stop based on this notice. So Rodriguez refers to ordinary inquiries as a permissible part of the stop. And here the argument goes they were waiting 90 minutes, I guess, for a return call from the FBI. So presumably if the FBI had been more prompt and called them back in two minutes, we wouldn't be sitting here today. But I guess what's your argument that calling the FBI if somebody, you've pulled somebody over for legitimate, for a traffic violation, and they're on the no-fly list, that simply making a call to the FBI is not part of the ordinary inquiries of Rodriguez? Well, Rodriguez talks about the parameters for which an investigation can occur constitutionally. And there needs to be reasonable suspicion to detain someone. You can, as you said, Judge Branch, you can engage in questioning and other things that are related to that investigation. And that is lawful, but beyond that, it is unlawful. So what happened here is Mr. Michal was lawfully pulled over for following too closely. There were some questions at the beginning of the detention that were proper and normal investigative questions within the context of investigating a traffic offense about his travel plans. It's clear under the law that that's allowed. Other questions about his identification. And then the detention changed meaningfully. And in order for that detention to have changed, what is required under Rodriguez and other similar cases is that there needed to be reasonable suspicion to justify that extension of the duration and the scope of the detention. And the officers simply didn't have that here. They saw the NCIC notice. They told Mr. Michal to exit the squad car. They told him to put his hands on the top of the car. They patted him down. They found nothing except his cell phone, which they confiscated. Despite knowing that he wasn't a clear threat because he had no weapon on him, they handcuffed him. They put him in the back of the squad car. He was handcuffed for approximately one full hour, and he was detained for approximately 91 minutes. They brought in two canine units, a narcotics-searching dog and an explosive-searching dog. The search was not only of the outside of his cab, of the cab of his truck. Officer Frink lifted up his dog despite having no alert and searched inside his truck cabin. Even after the officers received a call back, I'm sorry, even after the officers searched his cab, the cab of his truck, and found nothing, they still kept him detained and handcuffed for approximately 20 minutes until they finally got a call back from the FBI. So what Rodriguez and other cases require is that at every step of the extension of the duration and the scope of the stop, there was reasonable suspicion and then probable cause for the search. And the officers simply didn't have that here. And again, to the extent that they look at the NCIC notice as that reasonable suspicion and probable cause, it told them, don't look to this notice for justification for detaining someone. Don't look to this notice for justification of probable cause. It essentially lays out clear Fourth Amendment law in the notice itself. And I want to respond to one other thing, if I may. I'm sorry, Your Honors, I see I have just two more seconds. Is it okay for me to finish this final point? Yes. Thank you, Judge Pryor. So there was some pointing to by opposing counsel of evasive behavior or changing of the story by Mr. Michal. And I think maybe, Judge Carnes, you alluded to this. On the face of the complaint, all that is alleged is that Mr. Michal was cooperative and compliant. And opposing counsel pointed to what they conclude was evasive behavior and changing Mr. Michal's story as something that the district court missed. To the contrary, the district court said, when defendants are asking me to find evasive, uncooperative behavior on the face of the complaint, yes, Your Honor. Let me cheat in and get some of your last remaining minutes. You are the master of the complaint. But paragraph 48 seems to favor the defendants. And you say the terrorist screening center, which the Federal Bureau of Investigation administered, maintains the consolidated watch list. It describes the watch list as, quote, a single database that contains sensitive national security and law enforcement information concerning the identities of those who are known or reasonably suspected of being involved in terrorist activities. And then on paragraph 50, you say nominations to the list must meet a reasonable suspicion standard based on articulable intelligence or information. That sounds like you're making their case for them. Your Honor, I disagree. And to the extent that we're looking at these allegations, I'd also point you to paragraph 52, where it says specifically that concrete facts are not necessary to satisfy the reasonable suspicion to get some information. How can you square that with those who are known or reasonably suspected of being involved in terrorist activity? Well, Your Honor, that's how the terrorist screening center describes the watch list. But then the guidance for how you get on the watch list is different. Now, what document are you talking about then when you say that? Those two documents you just mentioned. Is that the NCIC guide or is that the report that the terrorist center puts out occasionally? Your Honor, based on these allegations, I'm not sure, and I'm sorry that my memory is failing on that. But, Judge Farns, if I can, I would say, you know, to a certain extent, this is not relevant to the qualified immunity question because there's no allegation that the officers here knew about the terrorist screening centers. Yeah, but you've charged them with knowledge of it. So you've got to, I mean, come on. You cite the parts that favors your case and leave out the other parts. We have law very clear saying that if a document is referred to in the complaint, we can consider the entire document. So, Your Honor, let me just clear something up. What we're alleging is only that they saw those, I think it's three paragraphs of the NCIC notice. And so what the officers had knowledge of during the stop was only that there was this notice that said this person may be on a terrorist watch list and do not detain him on that basis. The problem with that is there's the communal knowledge doctrine, which says if law enforcement officers that you consult or that advise you have knowledge, you're treated on an objective test basis as having the same access to that knowledge. But I'm just telling you that seems to be in tension with me. Judge Hunt, I think I understand what you're... Well, I mean, it's clear. It's not, I hope it's not foggy what I'm saying. You've alleged that you get on there if there's reasonable suspicion or knowledge that you're a terrorist. First, Your Honor, I disagree with that characterization. But fundamentally... Maintains the watch list as, quote, a single database that contains sensitive national security and law enforcement information concerning the identities of those who are known or reasonably suspected of being involved in terrorist activities. And Judge Barnes, I completely agree that that is what paragraph 48 says. But then the following paragraphs go on to explain how the process for getting on the watch list is actually very loose and is based essentially on a reasonable suspicion of a reasonable suspicion for which concrete facts are not necessary. But again... So you've contradicted yourself in the pleading. Is that what you're saying? No, Your Honor, that's not what I'm saying. Counsel, I'm sorry. I'm arguing with you, and that's not fair to everybody else whose time I'm taking up here. So let's bring this to an end. I get your point. I just was concerned by that, but you know my concerns. Yes, and Your Honor, can I wrap up the response? I thought you just did. But then you threw another question at me. Go ahead. Thank you, Judge Breyer. So I would just say that those allegations explain how the TSC describes the watch list itself and then talks about the actual selection criteria for getting on the watch list. But again, the allegation is that the only notice about the watch list that the officers at issue had here were those three or four paragraphs that said this person may be on the terrorist watch list, but do not detain him. Thank you, Your Honors. Three brief points in response. First, this is a qualified immunity case. The question is, did the officers have notice based on clearly established law? There's no similar factual case out there. The Supreme Court recently made very clear in the Fourth Amendment we need a case with similar facts. On the actual analysis, counsel on the other side starts to drift into a subjective analysis. What were the officers saying they were doing? What did they say to Mr. Mishal? But the question is, from an objective perspective, what facts did they have? And there were several facts here. We're not just relying on any one of the facts, and we're not just adding up the individual facts. We're saying that in combination they suggested criminal activity. And on the National Crime Information Center notice point, again, a notice from the Federal Government, it's not even from the Federal Government directly, coming from a crime database, does not create Fourth Amendment law. Officers are not liable for damages in their individual capacity based on the fact that a notice suggests that they did something. But doesn't it go to how reasonable their behavior was if they, in fact, saw this notice? I don't think local law enforcement, state law enforcement, is obligated to treat facts the way that the Federal Government says they should treat facts. What this notice does, there's two ways to look at this. One is that the officers were just trying to follow the notice, but I don't think that's the right inquiry here. What this notice told them was that this individual was on the terrorist no-fly list. That's the fact that they're dealing with in terms of looking at the other facts in front of them and trying to decide whether there's, on the reasonable suspicion side, objective facts that allow them to investigate, and on the probable cause side, a substantial chance of criminal activity. And we don't want to handicap officers who are trying to make split-second judgments on the road about information that suggests that there was something serious. And I know they didn't find anything here, but probable cause is about probability, about whether the officers were investigating properly, and they certainly had the information to investigate here, even if it didn't turn up anything in this case. Suppose they didn't see this caveat, and they just knew he was on the terrorist watch list. You would argue that's reasonable suspicion enough and probable cause to stop him searching 90 minutes, an hour, in the back of a police car handcuffed, right? Two things. One, not just this notice. We're dealing with the combination of the Super Bowl and some other... I understand that, counsel, but... The other thing is, this was not a 90-minute Terry investigative stop. The initial traffic stop took 30 minutes, and I would point this court to the Acosta decision where this court held that a drug... What about the answer to my question, though? I think that in combination with these other factors here, it did justify the 50-minute stop because the officers needed time, or the 60-minute stop because the officers needed time to do the investigation. Cops in every jurisdiction can stop this fellow with reasonable suspicion because his name's on there whenever they see him driving through their town. We are not asking this court to hold that this no-fly designation on its own is enough to stop someone investigating. Okay. Thank you. What information do they have that he had anything to do with drugs? What's the justification for the dog sniff, the drug dog sniff? The focus here, of course, was the explosives and the explosives dog. The court in Rodriguez and in Illinois versus Cabales made clear that you can do other investigation while you're doing something for which you have justification. But this wasn't... Well, the dogs went in one at a time, did they not? The drug dog, the second drug dog happened while they were still waiting for the FBI clearance call to come back. If they had gotten the call back from the FBI but then said, well, actually, maybe we should search for drugs now, then you'd be in a case like Rodriguez where the initial investigative justification has ended and they're trying to extend the stop again, but that's not this case. But to go back to Judge Karn's question just a minute ago, this gentleman is on the no-fly list. He drives into a town. He commits a traffic violation, gets pulled over. They're aware of that. He's a commercial delivery driver. He says, I have just delivered something to a supermarket, to an office building. If we rule in your favor, how is this not giving everybody the ability to pull this gentleman over as long as he remains on the no-fly list and continues to commit traffic infractions? I think a clear opinion from this court saying that these facts here, the connection to the Super Bowl made it more the concern that the officers had here more serious. There was a clear connection to terrorism that wouldn't be there, say, an individual, if this individual was dropping off a load of groceries at a Walmart, the same sort of thing. Not a load of groceries, but a delivery to a supermarket, a delivery to a courthouse, a delivery to an elementary school. He's a commercial delivery driver. And I think the Super Bowl connection here does draw a distinction. So it's only things that have been designated by the federal government as a Homeland Security special event. So, I mean, is that the distinguishing factor? I mean, courthouses have been under attack. Schools have been under attack. Why are those not enough to say you're on the no-fly list and you've delivered to that place? We're not taking a position on exactly where the line should be drawn. I think this is clearly on the side where there was reasonable suspicion, and if further cases came up where the facts got thinner and thinner, that would make tougher and tougher cases. But we think this court can just focus on these sort of very large events. I think Homeland Security tasked 200 agents for each Super Bowl to prep. It's a very big event. It's basically the biggest event you could do. But you have a Republican convention coming. You have a Democratic convention coming. You have a lot of things that guard this sort of designation. So I think in those cases, if an individual did make that delivery, if they were on the no-fly list, if they were stopped and the answers they were giving didn't totally line up, I think that is the sort of situation where we would want law enforcement to investigate further. Thank you. Ms. Isaacson, with the permission of the presiding judge, I would like you to file a supplemental letter telling us where two documents are publicly available. I know your argument that it doesn't matter, but trust me, I still want to see them in their completeness. And one is the NCIC policy handbook referred to in the complaint, and the other one is the terrorist office report handbook, whatever it is, that contains the cautionary language in it, if it does. And just get us a copy of it and tell us where it is publicly, where each one of them is publicly available. And if they're not publicly available, tell us that. And get it to us when you can. And if you feel the need to reply, I'm not implying you should, but if you do seven days after she sends that to us, you're welcome to. And a short explanation. I understand both sides' arguments about why I shouldn't be interested in that, but I am and would appreciate it if we could see it. Thank you.